The next item, U.S. v. Rafael Balderas. Good morning, Your Honors. May it please the Court, Heather Rogers, I'm here on behalf of Defendant Appellate Rafael Balderas. Your Honors, this is a case where Mr. Balderas' conviction must be reversed for three reasons. These reasons are all related to a stipulated removal process that amounted to no process at all. First, the government violated Mr. Balderas' Fifth Amendment rights by relying on an invalid removal to meet the deportation element. Are you with the Federal Defenders in San Diego? Your Honor, I was when I tried this case. What? I was when I tried this case. I had a baby since then and I'm now on my own, but I was. Okay. So how's the baby? She's doing very well. Thank you, Your Honor. Good. All right. The government violated Mr. Balderas' rights by relying on this invalid stipulated removal to meet the element of this crime, illegal reentry after deportation. This error was compounded and there was a new error created when the district court then refused to instruct the jury regarding the factual components of this procedure, this stipulated removal procedure, and the jury was unable to pass then on the elements of this procedure that actually make it a deportation proceeding. Well, now, just a minute, counsel. Yes, Your Honor. If I'm in a motion for suppress, and I'm a district judge and I was one, and I rule on a motion to suppress that the evidence comes in, why should I allow the jury then to make another ruling on the motion to suppress? What law do I look at that says that? It seems to me that if I'm making the ruling on the motion to suppress, you can take me out to the Ninth Circuit and say I'm out to lunch, or I'm not, but I don't see any reason to suggest that if I make a ruling on the motion to suppress that thereafter I let the jury make another ruling. What law says that? I understand, Your Honor. And what happened in this case is that... Now, that's what I don't understand. What ruling says that? What case says that I give my decision on a motion to suppress as to whether the evidence comes in or not to the jury? Can you cite me one case, counsel? This was a motion to attack the legal validity of the deportation. It is the same thing. Motion to suppress saying that that was not a legal way to take his Miranda rights, wasn't the right way to do it, and therefore it should not come in. Same exact issue. What's the case that says once the judge makes that determination, he's got to give it to the jury? There is no case, is there? Your Honor, I'm sorry, but just to explain what I think happened here. I challenged the legality of the stipulated removal procedure. I then wanted... And the court said? The court said, Your Honor, that there was a due process violation in this case, that it was an illegal procedure, however, that Mr. Balderas wasn't prejudiced by it. I then said to the court, well, Your Honor, in this case, the jury nonetheless does have to find a deportation proceeding. A mere physical removal from the country is not enough. A proceeding implies some level of process. I then asked the court to instruct the jury based on the regulation where the service lays out the factual components of the type of removal the government was using here to satisfy the element of the crime. So in this case, Your Honor, there were really two different questions. First of all, whether it was invalid as a matter of law, which the judge held that it was not. And second of all, even assuming that it wasn't invalid as a matter of law, did a deportation proceeding happen as a matter of fact? And the instruction that I offered to the court went to that second issue, not to the first issue. Let me ask you a second question. Why is this a time for a Miranda right? Why doesn't Salgado control in this particular case? I mean, there is absolutely no reason to suggest that when the information was taken from your client that there was any criminal proceeding even thought of, any criminal proceeding even attempted, all they did as a part of whether they were going to deport him or not and get him authorized deportation in a more quick manner, if you will, they took this information. What case leads me against Salgado or against the other case that has to do with those situations? Yes, Your Honor, even with the Miranda issue that occurred here, the case that I'm relying on is United States v. Chen. And in the United States v. Chen, what was the case about? Your Honor, in that case, this was a case where an immigration, excuse me, Your Honor, this is a case where the client was in administrative custody and he was suspected to be involved with alien smuggling, not at the time suspected of himself. Well, wasn't in Chen, the fact situation is that Chen was apprehended in a raid by criminal authorities? That's right, Your Honor. And so he was already chased down by the criminal authorities and then he's given some interrogation. That didn't happen here, did it? Well, Your Honor, but in that case what did happen was the immigration officers went and interviewed Mr. Chen with the intent of determining whether he was deportable. They then leveraged the information that they got, first going to him for an administrative reason. They then later decided to leverage that information against him for a perjury prosecution. Yes, that's exactly what happened, but after he'd already been apprehended by criminal authorities and was subject to criminal charges. Then they go in and do something, and at that point we said that's too close. Then we look at Mata Abundis, and I'm from Idaho, so I don't say it right. There again, we have a question by the INS, but it's after being arrested on charges of carrying a concealed weapon and possession of a firearm. On the other hand, if I look at Salgado and Solano Godinez, those were situations where there was no already arrested person who was questioned by the people. They were just questioned as a part of an administrative proceeding. As in this case, questioned as a part of an administrative proceeding. No criminal proceeding prior put together. No criminal conviction or arrest suggested, and they were just questioned as a part of the regular administrative process. Now, how do I get that into a Miranda violation? Your Honor, I think that there's a fine line between Salgado and between Chin, and I think that my case falls on the side of Miranda being required because this was a district where 1325 prosecutions were common, but more importantly in this case, Your Honor, the immigration officer testified at the hearing that she was familiar with Mr. Valderes' A file, that she would familiarize herself with immigrants' A files before questioning them. In this case, Mr. Valderes was alleged to have a 1326 conviction in his A file. Therefore, she should have known that he'd already been prosecuted for a 1326. Under this circumstance, her questioning regarding his immigration status is reasonably likely to elicit an incriminating response. She doesn't make the determination, though, that he's going to be prosecuted, does she? Yes, Your Honor. She can certainly refer him for prosecution. She didn't hear, did she? She didn't do so, Your Honor, but I think that we need to look in this case at what's reasonably likely to elicit an incriminating response. And certainly, Agent Stevenson should have known that her questions were reasonably likely to do so. Well, and then when we deal about harmless here, here we have more than this form. We have the testimony of arresting agents. We have the testimony of an agent as to whom Valderes talked. We have the information in his A file. So we didn't even need the form. And there was still more than enough evidence. Your Honor, the form in this case was very important and very probative evidence of the deportation proceeding, which really was the focus of the litigation in this case from the very beginning, whether what happened here even amounts to a deportation proceeding. It's our position that it doesn't. It's our position that what happened here amounted to a mere physical removal. Mr. Valderes asked for a hearing before an immigration judge. That was an undisputed fact. Instead, he was given a form that signed away his rights to an appeal, to counsel, and to a deportation hearing. Did anybody make him sign that form? Your Honor, we don't know what happened with that form. The agent, Agent Stevenson, testified that she doesn't read the form word for word. She testified to that at trial, that the aliens were put together in a group. She explains it to them, although she's not an immigration lawyer and she's certainly not an immigration judge. And then they can sign it if they wish to do so. We don't know whether he understood this form. You'll see in the record that the form is full of legalese. It's a long form. It's a complicated form. It's a form that the regulation requires that an uncounseled alien, if they sign that The immigration judge must make a voluntariness determination. They must make a voluntary determination. That's right. Or they must make a determination that is voluntary, knowing and intelligent. But is there any regulation that says they've got to hold a hearing? No, Your Honor, there's not. Is there any regulation that says they've got to put what they make in this determination down in writing so that it sits there someplace? Well, there is immigration opinions that suggest that. And I attended one such opinion, too. But there are also, I mean, the bottom line that I find about this is a little uneasy. Your client attended a group meeting. The waiver was read in English and Spanish. The proceeding was totally optional. He didn't need to participate. If he appears mentally unstable, unable to understand, or has more questions, he's automatically referred to the IJ. He signed the waiver. The document was given to the IJ. And now we're supposed to determine, based on no regulation which requires it otherwise, that this was somehow involuntary and unknowing. There's nothing in the regulations that says he's to have a hearing. There's nothing in the regulations that says that the IJ is to put some order together. There's nothing anyplace to suggest it and accept that. We have all of the forms which suggest that it's knowing and voluntary. And now because somebody doesn't put something in the record that nobody intended by the regulations to put in there, I'm to find it unknowing and involuntary. Now tell me why. Your Honor, I would disagree that there isn't well-settled law in this circuit determining what's required when one makes a voluntariness determination. Certainly in a criminal matter. We're not in a criminal matter. That's right, Your Honor, but it provides a good analogy. When a district court judge determines. It doesn't provide a good analogy because, again, we're in an administrative process. I understand. We're in a process that has been accepted out of the normal criminal things. Well, in any event, Your Honor, certainly voluntariness determination must mean something. You're saying that in many instances it invariably leads to a criminal prosecution. That's correct, Your Honor. It certainly does. And furthermore, the regulation very carefully has two separate procedures, one for counseled aliens and one for uncounseled aliens. I believe that that barely, if it does, brings this regulation in line with due process because an uncounseled alien has to have some meaningful judicial oversight before he waives the panoply of rights that were waived in this waiver. In this case, what we do know is this man asked for a hearing. He was then put in a room with an immigration agent, not a judge, not a lawyer, an agent who said on the record, it's not my job to give these people advice. He then is bused to the border a few days later without ever having any meaningful oversight of a judge, not through a hearing, not through a judge's simply reviewing to determine whether he was competent, whether he was intelligent, whether he understood these things. In the end, this record left us confused about what language this man spoke who grew up in the United States and was advised in Spanish. Your Honors, in this case, there has to be more. This is a woman who takes a case. What case says there has to be more? In an administrative process. We're not talking a criminal conviction here. We're talking in an administrative process where he is coming across, he's totally illegal, come across the border, going in front of the administrative law judge, I.J., title, and that I.J. is talking to this particular person, no regulation suggesting that the I.J. is supposed to be a copy of anything, nothing suggesting the I.J. is supposed to do something in that regard. He was given every last right every other person in that hearing or in that assembly group meeting was given. Your Honor, the regulation, 8 CFR 1003.25, says that the I.J. must determine that the alien's waiver is voluntary, knowing, and intelligent. And because that didn't happen here, it's our position it's invalid. May I reserve a minute, Your Honor? All you can say is there are no record that it didn't happen. And you're suggesting because there isn't some record that was already not even contemplated under the regulation that that sustains the record. Isn't that what you're saying? There's no record that it didn't happen. He signed the form. But, Your Honor, everyone agrees that there was no hearing here. How could this immigration judge understand whether Mr. Balderas had the intelligence and the capacity to waive all of these rights if you never saw him or interacted with him in any way? Your Honor, I'd like to reserve the last 30 seconds, if I may. Good morning, Your Honors. May it please the Court. Mark Rady for the United States. Your Honor, I believe there is an underlying premise to the defense argument, which is basically that unless an alien gets a full-blown hearing in front of an immigration judge, it's a sham proceeding. But the way that the law is structured and the way that the precedents have come out, that is not true. There are a number of streamlined procedures that have been upheld against challenge, reinstatements of removal, administrative removals. In this particular procedure at issue in this case, stipulated removal is expressly provided by statute in 8 U.S.C. 1229 A.D. by Congress. Well, tell us what happens here, simple language. It picks somebody up. Correct. It takes us through the process. Absolutely. It starts out just like any other process. There's a notice to appear. Agent Stevenson then testified below. She's a stipulated removal officer. Well, I'm just going to take the whole picture. It's a notice to appear. Correct. It goes to so many people. They bring everybody in a room. Right. Okay. And they have a court reporter there. I believe they do. Yes, in this case we don't have a record of that proceeding, but I believe that Agent Stevenson testified that sometimes there are. But what she testified was. . . Okay. Are they supposed to have a court reporter? I'm not sure, Your Honor. You don't know. Don't know. So you're not sure whether they keep a record or not. So how many people are in a room together? She testified that on average 10 to 15 people are brought together as eligible for this relief. And what she does, it's a two-step process. First she gives them a collective explanation, and then she goes individually and says, Are you, in fact, interested in this procedure? And as the district court found below. . . Well, what language was she given? She testified in the first group meeting it's given in both English and Spanish. And the form itself has English and Spanish with every single paragraph that's at issue. And so when she sits down individually and asks these people are they interested, then the process goes forward. Interested in what did she say? Interested in what? In a stipulated removal. Basically signing, you know, making the process go quicker. And then they. . . And she also testified below this as a benefit because it allows the alien to reapply for admission sooner than would otherwise be the case. And she said in her own words, This is a voluntary procedure. You read the record below, and the district court found as much. This isn't a coercive. This isn't inherently coercive. Agent Stevenson testified if the defendant appears or the alien appears mentally unstable, if the alien appears not alert, not responsive. She even had a litmus test. If they ask three or more questions, I set that file aside, and the alien goes to the immigration judge. That's the procedure that she testified to. Now, and she's testified from habit and custom. She admitted that she didn't specifically remember this particular alien, but the parties accepted that testimony, and that was the habit and practice. She's been doing this for 18 months. She does 200 to 300 of these a month. This particular alien was up in Lancaster at the Mira Loma detention facility. That's the process, Your Honor. And then once the paperwork is signed, it then goes to a legal department, and that's where government attorneys review it. Agent Stevenson testified if it appears that the alien is eligible for relief, she makes a note of that and forwards it to the attorneys, whose attorneys Where are the government attorneys located? I believe in the facility. That wasn't exactly specified, but I believe that they were in the facility, Your Honor. But there is a document. It's called a concurrence. The attorneys, if they don't agree that a stipulated removal is the right way to go, they will not sign that document. But wherever they were located, in this case, the record shows that they did sign off on that. And then Agent Stevenson said the last process is once she gets that concurrence, she puts together What do these attorneys look at when they sign off on a process? Well, I believe the actual waiver itself. They look at the alien file. She referenced something called a T file. It's a temporary file. It's comprised of relevant documents. That's what I believe is the record indicates, Your Honor. And then that goes to the immigration judge. That judge has the final say, in this case, issue the order. Well, where's the immigration judge at the facility? That I'm not – I don't know that exact detail, Your Honor. Have you ever attended one of these? No, I haven't. Have you? Yeah. They happen. These papers come to us. We're on the criminal side. So we aren't, as a matter of course, actually participating in these things, Your Honor. But what does this record show, then? Defense, it's almost like a mantra. They repeatedly say this was a sham proceeding. This was like a mere physical removal. I would respectfully submit that based on what the record shows is the farthest thing from that. This isn't a case where somebody simply took somebody in a van, drove them to the border, and dumped them over. Have the notice to appear. We have at least five different documents here that are not much different, in the end, from what is present in the ordinary course. And the single most important one of those is the executed warrant of removal. This case, this court, in United States v. Epata-Martinez and United States v. Hanna-Cardenas, said that an executed warrant of removal, by itself, is enough to prove a deportation proceeding. Here we have not only that document, but the testimony of Agent Stevenson, and all the other documents that are supposed to be issued in due course, starting with the notice to appear. That's not a mere physical removal. That's not a sham proceeding. Segueing back to the first issue, when this defendant was given a full opportunity to litigate the legality of the removal pretrial, exactly as the Supreme Court envisioned in the Miranda-Lindosa-Lopez case. Yes. Breyer. How was he allowed to do that? Because since this administrative removal is an element of the criminal offense,  He did it by actually bringing the litigation. It was litigated over several months. Plenty of briefing, supplemental briefing. Well, that's after they got him again, huh? Well, for this case, yes. For this case. But when he first signs all those papers, he doesn't have any legal counsel. No, he doesn't, Your Honor. Yeah, that's okay. And that may be an unfortunate reality of our system, but that law is settled. Criminal context, you have a right to free counsel. Immigration context, as Judge Smith indicated, it's a civil proceeding. They don't have a right to free counsel. But in this case, he signed a document and he waived his right to appeal. That's the whole point. I mean, it wouldn't be a stipulated removal if it had to include a hearing for all of these things. I think that's another sort of just a common-sense analysis. Well, what he did at that time, when you have them all in one room, see, he violated the law. He was here illegally. Well, the defendant, of course, Your Honor. He was here illegally. And so are they told then that while you're here illegally, you could get whatever the penalty is, two years for the first offense. But if you come back again, then it goes up to five. Well, those are the warnings that are provided. But if you're talking about the process where Agent Stevenson is discussing the stipulated removal, there's no discussion of criminal charges at that time. As Judge Smith indicated, this defendant hadn't been arrested on criminal charges. No indictment had been brought. Agent Stevenson even testified on a stipulated removal officer. That's what I do. I think two years is fine. A police officer stops you and could give you a ticket, but says, well, I'll let you go. Don't do it again. And then you do it again. And then you get a more severe fine. This is the second time. I don't know if I follow, Your Honor. Are you referring to the Miranda issue now? No, I'm just talking about the fact that this person doesn't know that, well, we're giving you a break now. Stipulated removal, leave. And you go back to your home. And what you did was unlawful. But if you come back again, we're going to look at this offense or this situation, and we're going to give you a much more severe penalty because this is the second time it's happened. They may not have said that in as many words, Your Honor. No, I don't say that. No, but that would go to the foundation of our entire system. Ignorance of the law cannot be an excuse. If this defendant is given clemency and then decides to come back and flout the law anyway, he or she ought to know full well that something, a hammer might be coming in the near future. In this case, he was removed and he came back two days later. That showed how much of a respect he had for the laws of this country. So he was prosecuted pursuant to the process of law. He had every opportunity to challenge this removal before trial, and that's where that's supposed to happen. And going back to another point, this is sort of the third issue, and I believe Judge Smith alluded to this. Well, you know, that's common. That's a common, pretty well-known that gets somebody, some bad cross the border. They're going to be back in a couple days anyway. Maybe when reality works, Your Honor, but the law doesn't put that burden. We know that happens a lot. It's happening as we speak. True. Sometimes it's two days. Sometimes it's two months. Sometimes it's two years. Sometimes it's two hours. But as the law holds, and you see this in Solano-Godinez and you see it in Salgado, that sort of, the law still presumes that somebody will, a reasonable person will abide by the law. And it's not within the scope of Miranda, a reasonable expectation that somebody will reviolate. And for purposes of those issues that are raised here, that kind of expectation doesn't come into play. Another point I just want to establish before I sit down on that first issue, we submit on our arguments that due process wasn't violated, but there is another issue, prejudice. It's an issue I've seen raised a lot in our district in the last few years. Defense counsel trying to argue that they don't have to show prejudice whatsoever, but the law couldn't be any clearer to the contrary. Since 1992, in this court sitting en banc, held in United States v. Proetovar, prejudice is a necessary showing. In this case, by the time of that January 2006 stipulated removal, this defendant had a 1999 conviction for felony possession of a firearm. This court has clearly held in the case of United States v. Castillo-Rivera that such a conviction is an aggravated felony. By the time he comes to the stipulated removal, therefore, he is statutorily ineligible for any relief. And when I looked at the reply brief, it appeared that there was some confusion. I think the way the defense was characterizing our argument was that we were relying on the 245A2 conviction. No, that's the 1992 conviction for assault with a deadly weapon. The one that we're talking about that rendered him statutorily ineligible for any discretionary relief at the time of the removal, stipulated removal, is that 1999 conviction. And there is no response by the defense to that argument, nor can there be. So their only argument on prejudice, it's creative, I'll give them credit, but it's convoluted and it has no precedent in the law. Look at the very first sentence that they write in their opening brief on the prejudice analysis, I believe it may be the second sentence. It talks about the 1997 removal. That removal was not an issue in this trial. The government didn't rely on that removal. We only relied on the 2006. The basis for that 2006 removal was entry without inspection, which the precedent of this Court has held stands alone. 2006 removal wasn't a reinstatement. It didn't incorporate by reference anything that came before it. It stands on its own. That said, that felon in possession conviction renders him statutorily ineligible. He cannot show prejudice. My esteemed opponent will probably get up here and try to explain again how this was a sham proceeding. I've already addressed that. Ask her about that prejudice, because even if you were to assume the worst set of facts, this defendant wasn't eligible for relief. That's what prejudice requires, plausible grounds for relief. Without that, that 1326d motion must fail. Unless there are any other further questions, the government will submit. Well, you know, you have a good office there in San Diego. I appreciate that. One of the reasons you have a good office is that you've got very good federal defendants. They raise the bar for you in your office and make you better lawyers. I agree. And so I'm impressed that you recognize that. Okay. Thank you. I'm going to try to make this a long 27 seconds. Your Honor, I first want to address the prejudice argument. In this case, prejudice was not the grounds for removal in 2006. It was entry without inspection. Under the case of Mendez, there cannot be a lawful entry without a lawful departure. It's our argument there was no lawful departure in this case because the 1997 process was flawed. Finally, Your Honor, process is what makes something a deportation proceeding. This was a lack of process. All judicial oversight was transferred to an immigration agent. This is not what the regulation contemplated. This is unconstitutional, and it's our position that this deportation simply cannot be used to satisfy the elements of this crime. What does the regulation say about who conducts that hearing? Your Honor, the regulation doesn't refer to a hearing, but it does have two pathways, one for counseled aliens and one for uncounseled aliens. Okay. Uncounseled aliens must have that judicial oversight of the immigration judge making a determination that the waiver was no involuntary. Okay, so there's a regulation on that. That's right, Your Honor. Thank you. I appreciate it. Thank you. Thank you for your argument, both of you. Thank you. You know, I've got to tell you a quick story. This involves an old, well, I guess maybe I'm older than he was at the time, a district judge in San Diego who was Barry Goldwater's cousin. They named a courthouse after him there, right? What's it called, that courthouse? Edward something. It's a shame that I can't remember the last name. No, it's just up there. Schwartz, Edward Schwartz. Not Schwartz. Before Schwartz. Oh, that's reneged. No. He signed the Constitution and was one of the drafters of the Constitution of Arizona. The first name was Jacob. Jacob. Well, anyway. It wasn't Udall, was it? No. That's the only Arizona name I know besides Goldwater. Or besides the one running for election. Well, wait a minute. He wasn't Goldwater's cousin. He was a cousin to the Secretary of Defense under Ronald Reagan. Remember who that was? Well, anyway, he'll come to me after you leave. But he, I was down there back in 1967 or 68 when, you know, the problems that you have there now, they're still in full swing then. And so he called me over and he said, come on into my office. So he had a little office over there. And I walked in with him. And here were maybe 20 people that were like the huddled masses, you know, sitting in there frightened. And I think they were people, they just picked up and went across the border. And Jacob Weinberger was his name. Jacob Weinberger. There's a courthouse named after him. Dick Chambers saw that that was done. And he was Casper Weinberger's, I think, brother or first cousin. So he pointed to all these people, this little old man walking in there. And he said to me, he probably was in his 90s, he said, do you see these people here? I said, yeah. He said, this is my family, you know. And then he'd sit there and explain to them what was involved, you know. And very kind, fatherly or grandfatherly terms. But I guess since Jacob was gone, they don't have it anymore. It's too bad, isn't it? Yeah, he was Casper's brother or first cousin. And he was here in the Southern District when the Southern District was in L.A. But then the Southern District went down to San Diego and he stayed down there. So I guess it was a more compassionate and friendly world then. So try to make it that way again. It'll all be better off. All right. Thank you. All right. Let's, uh. This next one. Uso. Huh? Uso. James Uso.
judges: Pregerson, Smith, Collins